UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

*********************************************

| | |
|---|---|
| Dominic Ali, | * |
| Plaintiff | * |
| | * |
| v. | *    12-cv-00364-SM |
| | * |
| | * |
| Warden Edward Reilly, Chaplain Dana Hoyt, | * |
| Scott Watson, John Masse, Shanon Berwick | * |
| Defendants | * |
| | * |

*********************************************

### STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OBJECTION TO PLAINTIFF'S MOTOION FOR SUMMARY JUDGMENT

NOW COME Warden Edward Reilly, Chaplain Dana Hoyt, Lts. John Masse and Shanon Berwick, and Corrections Officer Scott Watson (together the "Defendants") by and through their counsel, the Office of the Attorney General, and submit this memorandum of law in support of State Defendants' Cross-Motion for Summary Judgment and Objection to Plaintiff's Motion for Summary Judgment:

## I.   INTRODUCTION

This action arises from a complaint filed by Dominic Ali, an inmate at the Northern New Hampshire Correctional Facility in Berlin, New Hampshire (NCF), in which he asserts that NCF personnel violated his rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et. seq. (RLUIPA), the Free Exercise Clause, the Fourteenth Amendment Equal Protection Clause, and New Hampshire Constitution Part I, Article 5.

Plaintiff has been incarcerated in New Hampshire since February 2, 2009.   On May 22, 2012, the New Hampshire Department of Corrections (NHDOC) transferred Plaintiff from the

1

New Hampshire State Prison for Men in Concord, New Hampshire (NHSP) to NCF. Plaintiff's various causes of action allege infringements upon his right to practice Islam and participate in Ramadan fasting at NCF.

By Report and Recommendation, dated June 3, 2013 (ECF Doc. 9), the Magistrate Judge (McCafferty J.), permitted Plaintiff to go forward with several claims including: 1) First Amendment, RLUIPA, and Pt. 1, Art. 5 claims for injunctive relief relating to NCF's alleged failure to provide access to Jum'ah services; 2) a damages claim for alleged First Amendment violations pertaining to access to Jum'ah services; 3) First Amendment, RLUIPA, and Pt. 1, Art. 5 claims for injunctive relief regarding the alleged denial of reasonably healthy Ramadan food; 4) a claim for damages pursuant to 42 U.S.C. § 1983 regarding the alleged denial of reasonably healthy Ramadan food; 5) an equal protection claim for damages and injunctive relief pursuant to 42 U.S.C. § 1983 and for injunctive relief under the state constitution regarding the alleged denial of reasonably healthy Ramadan food; 6) First Amendment, RLUIPA, and Pt. 1, Art. 5 claims for injunctive relief regarding Plaintiff's removal from the Ramadan fasting list; and 7) a claim for damages pursuant to 42 U.S.C. § 1983 regarding the removal from the Ramadan list.

Even viewing the facts in the light most favorable to Plaintiff, this court should grant Defendants' cross-motion for summary judgment because Plaintiff has failed to exhaust the prison's internal grievance system. Plaintiff's failure to file administrative requests and grievances according to the procedures and timelines established by NHDOC prevented prison administration from addressing Plaintiff's complaints internally according to its own structured grievance process. Consequently, all of Plaintiff claims are barred by the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a).

Additionally the facts as pled do not demonstrate that Defendants have imposed a substantial burden on Plaintiff's religious exercise, that Plaintiff is unable to practice his religion due to any actions for the Defendants, or that the Defendants practices violate the Establishment clause, Equal Protection clause, or New Hampshire Constitution Part I, Article 5.  In the alternative, even if the Court finds facts sufficient to establish a substantial burden under RLUIPA or the First Amendment, the imposition of that burden is in furtherance of a compelling governmental interest, and is the least restrictive means of furthering the compelling governmental interest; therefore, Defendants have not violated RLUIPA or any state or federal constitutional provision and are entitled to judgment as a matter of law.

## II.  FACTS RELEVANT TO SUMMARY JUDGMENT

### A.  Lack of Jum'ah Services

New Hampshire Department of Corrections Policy and Procedure Directive (PPD) 7.17 permits the "celebration of the sacramental rituals necessary to meet minimal requirements of a given religious faith, providing there is an Approved Religious Volunteer to lead such rituals or if the chaplain is qualified to lead rituals of that particular faith."  Exhibit A-1.  PPD 7.17, III (E) defines the term "Approved Religious Volunteer" as a "[r]eligious volunteer who has met all institutional application requirements and has obtained volunteer training."  *Id.*

Plaintiff asserts that the Jum'ah service, which is held every Friday and led by an Imam, is the central Islamic religious ceremony.  Am. Complt. ¶ 8 (ECF Doc. 8).   Plaintiff claims that there have been no Jum'ah services held at NCF since his arrival in May 2012.  *Id.* at ¶¶ 15–19; *see also* Complt., Allegation 1 (ECF Doc. 1).

Pursuant to PPD 7.17, Jum'ah services require volunteer support and despite significant efforts by NCF Chaplin Dana Hoyt, local Islamic communities in New Hampshire have been

unable to send a volunteer to lead Jum'ah services on a consistent basis at NCF.  Exhibit A, *Affidavit of Dana Hoyt* ¶ 10; *see generally* Ex. A-4.  NCF's remote location in the northern and sparsely populated portion of the state make it difficult to find a local volunteer or a volunteer from another area willing to travel the significant distance to the prison.  *Id.* at ¶ 13.  Chaplin Hoyt's search for a volunteer Imam to consistently lead Jum'ah services at NCF is ongoing.  *Id.* In the meantime, the Chaplain at NHSP in Concord has located an Imam who, since December 2012, has been regularly performing Jum'ah services at NHSP once per month.  *Id.*  at ¶ 11–12. These services, as Plaintiff admits, are recorded and broadcast on the inmate television channel at NCF on every Friday afternoon so that Muslim inmates at NCF have access to the services. *Id.* at ¶ 12; Pl.'s Sum. J. Mot. at 5.  Throughout Plaintiff's incarceration, NCF has allowed Muslim inmates to practice their religion and has attempted to facilitate that observance in the same way that it does for other faith groups.  *See* Hoyt Aff. at ¶¶ 2–4, 14–16.  Chaplain Hoyt has continuously reached out to Muslim communities in an attempt to find a volunteer Imam and get Muslim inmates at NCF access to Islamic materials.  *See generally* Ex. A-4.

Since at least June 9, 2010, Chaplain Hoyt has been in communication with Mr. Mosfek Talukder, an Imam from the Islamic Society of Greater Manchester.  *See id.*  Chaplain Hoyt has been able to arrange for Mr. Talukder to provide his services to the Muslim inmates at NCF on many occasions between 2010 and the present whether it be by donating Islamic materials or by coming to NCF to give Jum'ah or Eid feast services.  *See* Ex. A-4 at 3 ("I will be free to attend . . . orientation  . . . and of course lead the prayer . . ."), 10–12 (referencing donation of books in electronic form), 14 ("I am coming up to Berlin . . . to lead the Friday prayer").  While Mr. Talukder was able to give Jum'ah services at NCF on a semi-regular basis in 2010, a change in employment made consistent visits more difficult.  *See id.* at 18 ("I won't be able to make it to

Friday from now on because I started a new job . . .").  Mr. Talukder and Chaplain Hoyt worked together to try and get another Imam, however, finding an Imam able to consistently visit NCF remained difficult.  *See id.* at 19 ("one of my friend is interested to carry on the Friday prayer for Berlin as I used to . . ."), 22 ("I know the situation is unfortunate as our Muslim community is moving away from NH and more toward Mass and other big cities . . .").

Chaplain Hoyt was able to arrange for Mr. Talukder to preside over the end of Ramadan Eid feasts at NCF in 2011, 2012, and most recently, this year on August 9, 2013.  Hoyt Aff. ¶ 16; *See* Ex. A-4 at 22, 24, 26.   At the 2012 Eid feast, Mr. Talukder and Chaplain Hoyt discussed Mr. Talukder coming to the prison on a monthly basis to teach the Muslim inmates and lead them in prayer.  Hoyt Aff. ¶ 16; Ex. A-4 at 40.  On October 16, 2012, Chaplain Hoyt contacted Mr. Talukder to follow up on their discussion regarding Mr. Talukder providing Jum'ah services at NCF.  *Id.*  Chaplin Hoyt arranged for Mr. Talukder to come up to the NCF for a meeting on Sunday October 21, 2012.  *Id.*; Ex. A-4 at 37, 39.  To enable interested Muslim inmates to attend the meeting with Mr. Talukder, Chaplain Hoyt met with several Muslim inmates, including Plaintiff, and invited them to attend.  Hoyt Aff. ¶ 16.  On October 21, 2012, Plaintiff and several other Muslim inmates met with Mr. Talukder.  *Id.*  Ultimately, however, due to time constraints, Mr. Talukder was unable to routinely provide his services to NCF.  *Id.*; Ex. A-4 at 42 ("I have thought about my future visit and honestly it is really difficult for me to come here on a routine basis . . .").  Mr. Talukder does continue to visit and lead prayer at NCF on a periodic basis.  *See* Ex. A-4 at 44.  For instance, Mr. Talukder presided over this year's Eid feast, taking time off from his other employment duties to do so.  *Id.* at 44–45.  At this year's Eid feast, Mr. Talukder, mentioned that he plans to attend the next Islamic feast at NCF this September.  Hoyt Aff. ¶ 16.

Plaintiff alleges that Mr. Talukder did not follow through with providing services at NCF due to "issues with the administration of the NCF, schedule and cooperation." Am. Complt. at ¶¶ 14–15. Further, Plaintiff contends that the NCF staff acted wrongfully in enforcing NHDOC Policy and Procedure Directive ("PPD") 7.17, which proscribes inmate-led groups, and thus prohibits an inmate from acting as Imam, requiring that an Approved Religious Volunteer lead the group instead. *Id.* at ¶ 16.

Despite the difficulty in locating a volunteer who can come to NCF on routine basis, inmates have additional avenues available to them to practice their religion. Inmates can reach out directly to faith groups in the community and seek additional guidance through direct correspondence or personal visits. *See* Ex. A-6; A-7. Like other recognized faith groups, Muslim inmates are allowed specific property important to their faith, are allowed to request dietary restrictions, such as the no pork diet important to some Muslim practitioners, are allowed facial hair restricted to the length allowed for security purposes and allowances are to be made at school or work to allow time for prayers if the inmate chooses. *See* Ex. A-1; A-8. Further, special arrangements are made during Ramadan to allow Muslim inmates to observe the restrictions of times that they can eat and, if an Approved Religious Volunteer is available, a feast at the end of Ramadan is allowed and provided. Ex. A-1.

NHDOC has only two Chaplain positions authorized in its budget for all three of its prison facilities. *See* Exhibit B, *Affidavit of William McGonagle* ¶ 3; *see also* Ex. B-1. From information gathered on all inmates in the offender management system (CORIS), the current statistics demonstrate that 35% indicate no religious affiliation, 25% identify as Catholic, and 25% identify as various denominations of Protestant. McGonagle Aff. ¶ 4; *see* Ex. B-2. Only 3% identify as Muslim or Nation of Islam. *Id.*; *see also* Ex. B-2.

The requirement that religious and all other group inmate activities be supervised by staff or an Approved Religious Volunteer is necessary to compelling security and institutional safety concerns as allowing inmates to be in positions of authority over other inmates has been documented to facilitate the formation of prison gangs, and has also lead to intimidation or strong-arming to obtain preferred food, canteen items, and even sexual favors for these self appointed leaders.  *See* Exhibit C, *Affidavit of Jon Fouts* ¶ 6; Hoyt Aff. ¶ 5.

### B.  Removal from Ramadan List

Plaintiff alleges that in the summer of 2012, prison staff improperly removed him from the Ramadan fasting list.  Complt. at Supporting Facts: # 3, ¶ 4.  Plaintiff contends that throughout Ramadan, Muslims fast during daylight hours.  Rept. and Rec. at 4.  Further, Plaintiff asserts that while Ramadan lasts approximately 30 days, the period of fasting may be extended to 40 days to allow individuals who break their fast for health reasons time to make up the fasting missed.  Complt. at Supporting Facts: # 3, ¶ 2.  On or about August 13, 2012, Plaintiff broke his fast, allegedly due to stress, and attended breakfast in the chow hall.[1]  *Id.*  Corrections Officer Watson, who knew Plaintiff was on the Ramadan list and thus knew that Plaintiff had received the Ramadan meals the night before, alerted Lieutenants Berwick and Masse.  *Id.* at ¶ 4; Exhibit D, *Affidavit of Shanon Berwick* ¶ 2.  Watson then brought Plaintiff from the chow hall to speak with Berwick and Masse.  *See id.* at ¶ 3.  Berwick and Masse questioned Plaintiff about why he was in the chow hall as he had already received his meals for that day when he picked up his Ramadan feed the night before.  *See id.*  Plaintiff explained that he had been working out and wanted to eat at the chow hall because he needed protein and eggs were being served that day.  *Id.*  Lt. Berwick consulted with Chaplain Hoyt about how to respond to Plaintiff's actions.  *Id.* at

---

[1] In a grievance to the Warden Plaintiff states that he did not fast that day because he "was in a bad mood."  *See* Ex. G-1 at 4.

¶ 4.  Chaplain Hoyt removed Plaintiff from the fasting list as the Ramadan 2012 Schedule explicitly stated that inmates who showed up for meals during the Ramadan period would be subject to removal from the fasting list.  *See id.* at ¶¶ 4–5;  Hoyt Aff. ¶ 18–19; Ex. A-9. Taking extra meals is a disciplinary offense.  *See id.* at ¶ 22.  Chaplain Hoyt had Lt. Berwick inform Plaintiff of his removal from the fasting list and that the Chaplain was available to discuss the matter if Plaintiff wanted to talk through the situation in detail.  Berwick Aff. ¶ 5; Hoyt Aff. ¶ 19. Plaintiff did not request to discuss the matter with Chaplain Hoyt.  Hoyt Aff. ¶ 19.

### C.  Ramadan Food

In the summer of 2012, up until his removal from the list, Plaintiff participated in Ramadan fasting.  Complt., Supporting Facts: # 3, ¶ 2.  During this period Plaintiff contends that Chaplain Hoyt did not provide the fasting inmates with "reasonably healthy food."  *Id.* at Allegation 2.  Specifically, Plaintiff contends that the Ramadan meals provided were "frozen and uncooked" and that the meals contained "something called birdseed that is dry mixed with rocks."  *Id.* at ¶¶ 3, 6.  The Ramadan 2012 Schedule demonstrates that prison staff gave the fasting inmates the equivalent of three meals that they received in the evening for the next day. Ex. A-9.  The breakfast meal consisted of "bagged breakfast foods" that contained a coffee cake or muffin, cold cereal, a juice and two pints of milk.  Exhibit E, *Affidavit of Joseph Pelletier* ¶ 4. The lunch meal consisted of: four slices of bread; one five ounce non-pork sandwich meat; two slices of cheese; one packet of crackers/chips; condiments; dessert (if available); and one pint of milk.  *Id.* at ¶ 5.  The dinner meal or "hot meal" consisted of whatever meal was served to non-fasting inmates that night and was also the same quantity of food.  *Id.* at ¶ 6.  The fasting inmates would receive this dinner meal as a cell feed that they could eat whenever they wished, which

according to Ramadan practice would be after sunset and before sunrise.  *Id.*  None of these food items are frozen and there is nothing called "birdseed" on the menu.  *Id.*

**D.  Prison Litigation Reform Act**

NHDOC has a PPD that sets out a multi-tiered administrative procedure for dealing with inmate grievances.  *See* Exhibit F-2, PPD 1.16.  Inmate request slips (IRS), which are the first level for any grievance, are addressed to the most appropriate unit-level staff at NHDOC.  Exhibit F, *Affidavit of Tanya Pitman* ¶ 3.  IRSs are a three-part form, consisting of a white, pink, and yellow carbonless copy.  *Id.*  The staff member/responder keeps the pink copy, and the inmate keeps the yellow copy.  The white copy is forwarded to offender records.  Exhibit H, *Affidavit of Nancy Wolcott* ¶ 2.  All IRSs received by offender records dated after February 2006 are scanned and saved on the NHDOC server.  Pitman Aff. ¶ 3.

Plaintiff did not file any unit-level IRSs that requested more nutritious 2012 Ramadan food or complained that the 2012 Ramadan food was inadequate.  Pitman Aff. at ¶ 6.  Further, Plaintiff did not file any unit-level IRSs to Chaplain Hoyt, or any other unit-level staff, requesting Jum'ah services.[2]  *Id.* at ¶ 7.   Finally, Plaintiff did not file a unit-level IRS complaining about being taken off of the Ramadan fasting list or requesting to be put back on it.  *Id.* at ¶ 6.

All grievances submitted to the Warden, the second level of NHDOC's grievance system, are written either on the grievance form or an IRS.  Exhibit G, *Affidavit of Edward Reilly* ¶ 2.  A copy of each grievance to the Warden is kept in the Warden's office.  *Id.*  The copies are made before the answer is returned to the inmate.  *Id.*  The grievances and inmate request slips are filed

---

[2] Plaintiff filed one IRS to Chaplain Hoyt regarding Islamic texts to which the Chaplain responded "Thank you – we would welcome any donated study materials – can I have their contact info to see if they would come in as volunteers?"  *See* Ex. F-1 at 2.  Further, on July 19, 2012, Plaintiff filed an IRS to S. Young requesting that he be placed on the Ramadan list.  *Id.* at 1.  This IRS appears to pertain to Plaintiff's initial placement on the Ramadan list as it occurred approximately one month before Plaintiff's subsequent removal from the Ramadan list.  *See id.*

alphabetically by year.  *Id.*  The Warden's office also maintains a grievance log of all incoming grievances from inmates to the Warden.  *Id.* at ¶ 3.

Plaintiff filed one grievance form and one IRS with the Warden, on August 13 and August 15, 2012, grieving his removal from the Ramadan fasting list.  *See* Ex. G-1 at 1–5.  Plaintiff did not file an IRS or grievance form with the Warden regarding the quality of the 2012 Ramadan meals.[3]  Reilly Aff. ¶ 7.  Finally, Plaintiff did not file an IRS or grievance form with the Warden about the lack of Jum'ah services.  *See id.*

All grievances that are submitted to the Commissioner, the third level and final of the NHDOC's internal grievance system, are logged in and answered directly, or forwarded to a designee that can best respond.  Wolcott Aff. ¶ 4.  Once they have been responded to, copies are made and filed in the Commissioner's Office, alphabetically by inmate name and by year.  *Id.*  Four years of records are kept in the Commissioner's Office, and records older than four years are stored in the building.  *Id.* at ¶ 5.  The Commissioner's Office also maintains a log of all correspondence, IRSs, or grievances from inmates to the Commissioner.  *Id.* at ¶ 6.  Over the entire course of Plaintiff's incarceration Plaintiff has never filed an IRS or grievance form with the Commissioner.  *Id.* at ¶ 7.[4]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[3] On July 3, 2013, Plaintiff filed an IRS with Warden Reilly complaining about the current meals for Ramadan 2013 in a nondescript fashion and cited this litigation.  Ex. G-1 at 7.

[4] The only communications from Plaintiff received by the Commissioner's office were two letters that Plaintiff wrote to U.S. Senator Shaheen that were later forwarded to the DOC by Senator Shaheen's staff.  *See generally* Ex. H-1.  In his first letter, Plaintiff requests a transfer to Maine.  In the second letter, drafted on December 13, 2012, Plaintiff relays problems with receiving his mail and state pay, and attaches copies of documents he filed with the state Superior Court.  *Id.*  One of these documents is a state court pleading that mirrors his instant Amended Complaint.  *Id.*  Plaintiff apparently filed this state court pleading as an addendum to a petition for habeas corpus that was pending at the time and handled by the Hillsborough County Attorney's Office.  The trial court granted the state's motion for summary judgment in that matter on grounds unrelated to Plaintiff's religious claims.

R. Civ. P. 56(a).  The court reviews motions for summary judgment "drawing all reasonable inferences in favor of the non-moving party while ignoring 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Sutliffe v. Epping Sch. Dist.,* 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)).  Cross-motions for summary judgment, are subject to the same standard, the court views each motion separately and draw all reasonable inferences in favor of the respective non-moving party. *See One Beacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can.,* 684 F.3d 237, 241 (1st Cir. 2012); *Pruco Life Ins. Co. v. Wilmington Trust Co.,* 2013 U.S. App. LEXIS 13317, 12-13 (1st Cir. June 28, 2013).

This standard is favorable to the nonmoving party, but it "does not give him a free pass to trial." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011). To be genuine, a factual dispute must be built on a solid foundation — a foundation constructed from materials of evidentiary quality. *See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011); *Garside v. Osco Drug, Inc*., 895 F.2d 46, 48 (1st Cir. 1990). "'[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative' will not suffice to ward off a properly supported summary judgment motion." *Rogan v. City of Boston,* 267 F.3d 24, 27 (1st Cir. 2001). *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013).

Summary judgment is appropriate when the "record reveals no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Contino v. Hillsborough DOC*, 2011 U.S. Dist. LEXIS 107241 at *10 (D.N.H. Sept. 21, 2011).  "[A] fact is material if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the

parties' positions on the issue are supported by conflicting evidence." *Lamarche v. Jordan*, 2009 U.S. Dist. LEXIS 48670 at *2 (D.N.H. June 10, 2009).

If the non-moving party's "evidence is merely colorable or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." *Robinson v. Gordon*, 2010 U.S. Dist. LEXIS 35978 at *3 (D.N.H. Apr. 12, 2010) (citation and quotation omitted).

The failure to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA) is an affirmative defense and need not be pled by the Plaintiff. *Jones v. Bock*, 549 U.S. 199, 216 (2007). In raising such defense, the Defendants must carry the burden of proving that the Plaintiff failed to exhaust all administrative remedies. *Cassanova v. Dubois*, 304 F.3d 75, 77, n.3 (1st Cir. 2002).

## IV. ARGUMENT

### A. PLRA

Plaintiff failed to properly exhaust the prison grievance process in regard to all of his claims. The PLRA, 42 U.S.C. § 1997e(a), imposes a mandatory requirement that prisoners exhaust their administrative remedies for each claim prior to bringing an action in federal court. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002). "A centerpiece of the PLRA's effort to reduce the quantity . . . of prisoner suits' is an 'invigorated exhaustion provision, § 1997e(a)." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006) (internal quotation omitted). An inmate's failure to comply with the PLRA results in dismissal of a plaintiff's claims. *See Medina-Claudino v. Rodriguez-Mateo*, 292 F.3d 31, 36 (1st Cir. 2002). "Exhaustion is no longer left to the discretion of the district court, but is mandatory." *Ngo,* 548 U.S. at 85. When a defendant asserts his or her rights under the PLRA, a court may not address the merits of a prisoner's claim until exhaustion

is established.  *See id.*; *see also Perez v. Wisconsin Dep't of Corrections*, 182 F.3d 532, 536 (7th

Cir. 1999).  This Court applies the PLRA to constitutional claims brought via 42 U.S.C. § 1983

and statutory claims such as RLUIPA.  *See Glenn v. N.H. State Prison Family Connections Ctr.*,

2013 U.S. Dist. LEXIS 99777 at *6 (D.N.H. 2013).

In order to fully and properly exhaust all available remedies, "a prisoner must file

complaints and appeals in the place, and at the time, the prison's administrative rules require."

*Acosta v. U.S. Marshals Serv.,* 445 F.3d 509, 512 (1st Cir. 2006) (quoting *Pozo v. McCaughtry*,

286 F.3d 1022, 1025 (7th Cir. 2002)).  Consequently, proper exhaustion cannot be achieved "by

filing an untimely or otherwise procedurally defective grievance . . ."  *Ngo,* 548 U.S. at 81.

The NHDOC has implemented PPD 1.16, a multi-tiered administrative procedure for

dealing with inmates' grievances.  Ex. F-2.  Under PPD 1.16, inmates are encouraged to resolve

any complaints informally, by discussing the matter with personnel.  PPD 1.16, I.  If such

informal means fail to satisfy the inmate, the first step of the formal grievance process is the

filing of an IRS with an appropriate unit-level staff member.  PPD 1.16 IV (A).  If the inmate is

unsatisfied with the response he receives to his IRS, he must file a written grievance with the

Warden.  PPD 1.16 IV (B).  The grievance to the Warden must be received within 30 days of the

response to the unit-level IRS.  PPD 1.16 IV (B)(1).  If the response from the Warden does not

resolve the issue, the inmate must file a grievance with the Commissioner.  PPD 1.16 IV (C).

The grievance to the Commissioner must be received within 30 days of the date on the Warden's

response.  PPD 1.16 IV (C)(1).  Grievance timeframes are "mandatory."  PPD 1.16 IV (E).

### i.  Failure to Provide Jum'ah Services

Plaintiff failed to make a unit-level request regarding the lack of Jum'ah services.  Pitman

Aff. at ¶ 7; PPD 1.16 IV (A) (requiring unit-level IRS before grievance to Warden).  Further,

Plaintiff did not file an IRS or grievance form or otherwise communicate to the Warden that he sought Jum'ah services.  Pitman Aff. at ¶ 8; PPD 1.16 IV (B).  Finally, Plaintiff did not file an IRS or grievance form or otherwise communicate to the Commissioner that he sought Jum'ah services.  *Id.*; PPD 1.16 IV (C).   As a result, Plaintiff did not comply with any of the three levels of the NHDOC grievance process.  *See* PPD 1.16 IV (A), (B), (C).  Plaintiff, therefore, is not entitled to proceed on any of his claims arising out of the alleged lack of Jum'ah services because he has failed to exhaust his remedies at each grievance level as required by the PLRA. *See* 42 U.S.C. § 1997e(a).

### ii.  Adequacy of Ramadan Food

Plaintiff failed to make a unit level, Warden level, or a Commissioner level request or grievance regarding the quality of the 2012 Ramadan meals.  Pitman Aff. ¶ 6; PPD 1.16 IV (A), (B), (C).   As a result, Plaintiff did not comply with any of the three levels of the NHDOC grievance process.  *See* PPD 1.16 IV (A), (B), (C).  Consequently, Plaintiff is not entitled to proceed on any of his claims arising out of the allegedly substandard quality of the 2012 Ramadan meals because he has failed to exhaust his remedies at each level of the prison's internal grievance system as required by the PLRA.  *See* 42 U.S.C. § 1997e(a).

### iii.  Removal from Ramadan List

Plaintiff did not file a unit-level request regarding his removal from the Ramadan fasting list.  Pitman Aff. at ¶ 6; PPD 1.16 IV (A).  Further, Plaintiff did not file an IRS or grievance form with the Commissioner grieving his removal from the Ramadan fasting list.  Wolcott Aff. at ¶ 7. Plaintiff thus did not comply with the first or third levels of the grievance process.  PPD 1.16 IV (A); PPD 1.16, IV (C); *see also* PPD 1.16 IV (E) (grievance timeframes are "mandatory.").   As a result, Plaintiff is not entitled to proceed on his claims that arise out of his removal from the

Ramadan list because he has failed to exhaust his remedies at each grievance level as required by the PLRA.  *See* 42 U.S.C. § 1997e(a).

Since the time has passed for plaintiff to grieve these issues to the unit, Warden or Commissioner, the complaint should be dismissed with prejudice.  This court and other courts in this circuit have dismissed claims with prejudice when the defendants have successfully shown failure to exhaust under the PLRA, as the defendant has done here.  *Palermo v. Daly,* 2013 U.S. Dist. LEXIS 26934 at *11-12 (D.N.H. Feb. 6, 2013).  Although the First Circuit has not addressed this issue, other circuits have affirmed with prejudice, where the lower court dismissed with prejudice because the time for exhaustion has passed.  *Johnson v. Louisiana ex rel. Louisiana Dept. of Public Safety and Corrections*, 468 F.3d 278 (5th Cir. 2006); *Giano v. Goord*, 380 F.3d 670, (2nd Cir. 2004) ("dismissal with prejudice, when remedies are no longer available, is required "in the absence of any justification for not pursuing [such] remedies") (citin*g Berry v. Kerik*, 366 F.3d 85, 87-88 (2nd Cir. 2004)).

## B.  RULIPA, First Amendment, and Part I, Article 5 Claims

The Plaintiff claims that the Defendants violated RLUIPA and the Free Exercise Clause by requiring that an Approved Religious Volunteer lead Jum'ah services rather than permitting a prisoner to do it, and therefore substantially burdened Plaintiff from practicing his religion.  RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997] . . . unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  In *Spratt v. Rhode Island Dept. of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007), the court stated that a claim under RLUIPA includes four elements.  First, a Plaintiff bears

the burden of proving that "(1) an institutionalized person's religious exercise has been burdened and (2) the burden is substantial. *Id.* (citation omitted). "Once a Plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest." *Id.*

Courts have found that RLUIPA provides greater protection to inmates' free-exercise rights than does the First Amendment. *Kuperman v. Wrenn*, 645 F.3d 69, 79 (1st Cir. 2011). Therefore, if the plaintiff does not meet his burden or if the defendant can demonstrate that a regulation is the least restrictive way to advance a compelling state interest, it satisfies RLUIPA, and the First Amendment Free-Exercise clause. *See Glenn*, 2013 U.S. Dist. LEXIS 99777 at *7.

Defendants are entitled to judgment as a matter of law because the facts, considered in the light most favorable to the Plaintiff, do not show that the Defendants have imposed a substantial burden on the Plaintiff's religious exercise. In the alternative, even if the Court finds that a substantial burden exists, it is in furtherance of a compelling governmental interest, and is the least restrictive means of furthering that interest. Moreover, since the Defendants have met their burden under RLUIPA, the Defendants are also entitled to judgment as a matter of law regarding the Plaintiff's Free Exercise clause claim. Finally, because the New Hampshire Constitution is no more favorable than the federal in this area, the court should dismiss Plaintiff's state constitutional claims as well. *See In re Smith*, 139 N.H. 299, 307 (N.H. 1994).

> i. **Failure to Provide Jum'ah Services**
>
>> a. **Defendants Have Not Imposed a Substantial Burden on Plaintiff's Religious Exercise**

The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The First Circuit, when defining "substantial

burden" in a religious context, has found that a substantial burden to religious exercise occurs

when a challenged restriction "puts substantial pressure on an adherent to modify his behavior

and to violate his belief." *Spratt*, 482 F.3d at 38 (citation and quotation omitted).

The Plaintiff argues that his religious exercise is substantially burdened because an

Approved Religious Volunteer is required to lead group religious activities.  Requiring an

Approved Religious Volunteer does not substantially burden the Plaintiff's religious exercise

because it does not put substantial pressure on the Plaintiff to modify his behavior or to violate

his belief.  *See Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (inability of inmates to

assemble as often as they would like, due to a dearth of qualified volunteers available to go to the

prison, did not "substantially burden" practice of their religion in violation of RLUIPA);

*Farnsworth v. Baxter*, 2008 WL 4279624, at *8 (W.D. Tenn. Sep. 12, 2008) (Defendant's

inability to locate a volunteer to worship with Plaintiff on the Sabbath did not substantially

burden his exercise of religion).  Further, the broadcasted recordings of the Jum'ah services

currently taking place at NHSP serve as a viable alternative to attending a live service performed

by an Approved Religious Volunteer when one is not available.  *See Shabazz v. Arkansas Dep't

of Corr.*, 157 Fed. Appx. 944, 945 (8th Cir. 2005) (holding that the use of a video-recorded

Khutbas is a viable alternative to the performance of a live Khutba.)

Furthermore, the Supreme Court has rejected the argument that "incidental effects of

government programs, which may make it more difficult to practice certain religions but which

have no tendency to coerce individuals into acting contrary to their religious beliefs, require

government to bring forward a compelling justification for its otherwise lawful action."  *Adkins*,

393 F.3d at 569 (quoting *Lyng*, 485 U.S. at 450-51); *see also Marchant v. Murphy*, 2010 WL

447781, *2 (D. Mass. Feb. 9, 2010) (stating "RLUIPA and the First Amendment are violated

only when *government* limits an inmate's right to worship according to the dictates of his

religious beliefs . . . . Incident effects of government programs . . . do not implicate the

substantial burden standard.") (citations omitted).

Defendants have not put substantial pressure on the Plaintiff to modify his behavior in

violation of his beliefs.  The Plaintiff's inability to attend group worship ceremonies is because

of a lack of available volunteers and not because of any prison policy or rule that directly

prohibits such gatherings.  *See Glenn*, 2013 U.S. Dist. LEXIS 99777 at *7.  Recently, in *Glenn*,

this Court granted summary judgment in favor of several NHDOC defendants named in an

NHSP inmate's complaint that PPD 7.17 prevented regular Jum'ah services from occurring at the

Concord facility.  *Id.* at *9.  The *Glenn* Court held that "[i]f the shortage of appropriate

volunteers was the reason the prison could not provide Jum'ah services, the resulting burden on

Glenn's religious exercise would not be attributable to the government . . . ."  *Id.* (citing *Bader v.*

*Wrenn*, 675 F.3d 95, 99 (1st Cir. 2012) ("Bader's problems at NCF-Berlin derive from a lack of

outside clergy, volunteer visitors, and practicing co-religionists in the prison.")).

The record on summary judgment here, as in *Glenn*, demonstrates that PPD 7.17 does not

in any way forbid Jum'ah services.  These services occur at NHSP in Concord and except for the

lack of a volunteer at the Berlin facility, Jum'ah services would occur there as well.  Hoyt Aff. ¶

13.  Chaplain Hoyt has made great efforts to locate volunteers to provide Jum'ah services at NCF

and continues to do so.  Hoyt Aff. ¶ 10; *see generally* Ex. A-4.  Further, as Plaintiff admits, the

Concord Jum'ah services are recorded and broadcasted on television at NCF every Friday.  Hoyt

Aff. ¶¶ 11–12.  Finally, while Plaintiff's complaint appears to assert that NCF somehow drove

away Imam Moshvek Talukder, the record indicates that this is simply not the case.  *See* Ex. A-4

at 42–43.  Summary judgment is thus appropriate.  *See Cadle Co. v. Hayes*, 116 F.3d 957, 960

(1st Cir. 1997) ("evidence illustrating the factual controversy cannot be conjectural or problematic . . . . Conclusory allegations, improbable inferences, and unsupported speculation will not suffice.")

> ### b. Even If A Substantial Burden Exists, That Burden Is In Furtherance Of A Compelling Governmental Interest, And Is The Least Restrictive Means Of Furthering That Compelling Governmental Interest.

Even if the Court finds that requiring that an Approved Religious Volunteer imposes a substantial burden on Plaintiff's religious exercise, Defendants are still entitled to summary judgment because the NHDOC has compelling interests in prison safety, security, and budgetary concerns and requiring an Approved Religious Volunteer is the least restrictive means of furthering these interests.

It is without question that "prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 724, n. 13 (2005). The Supreme Court does not read RLUIPA to "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722.

NHDOC's prohibition on inmate-led group religious service is the result of legitimate safety and security concerns. *See Shabazz*, 157 Fed. Appx at 945–46 (8th Cir. 2005). Allowing inmates to be in positions of authority over other inmates has been documented to facilitate the formation of prison gangs, and has also lead to intimidation or strong-arming other inmates to obtain preferred food, canteen items, and even sexual favors for these self-appointed leaders. Fouts Aff. ¶ 6 Hoyt Aff. ¶ 5.

Further, the legitimate penological objective of preventing security and administrative problems within the prison supports the NHDOC's prohibition against inmate gatherings that are independent of the direct supervision of appropriate staff or qualified volunteer. For example,

the NHDOC Chaplains at one time did attempt to supervise faith groups outside their area of religious training.  Hoyt Aff. ¶¶ 6–8.  This practice, however, had to be discontinued, due to disrespectful and threatening conduct by inmates in the faith group toward the staff.  *Id.*

Requiring Approved Religious Volunteers is also the least restrictive way for NHDOC to satisfy departmental budgetary concerns.  NHDOC only has funding for two Chaplain positions and must use these positions in such a way that appropriate religious services are provided to as many inmates as possible.  Because such a small percentage of the prison population identify as Muslim, it is not economically reasonable for NHDOC to hire a paid Imam.  *See* McGonagle Aff. ¶ 4.  This Court recently agreed in *Glenn*, holding that "[t]he Department's budgetary limitations coupled with the small group of Muslim inmates supports the decision to use Approved Religious Volunteers to provide Muslim Religious services as the least restrictive means to further a compelling interest."  2013 U.S. Dist. LEXIS 99777 at *11.  Conversely, the individual practice of religion is not banned.  Inmates may reach out to religious leaders in the community to assist in their religious advancement.  By requiring an Approved Religious Volunteer to lead group religious activities, NHDOC is achieving a compelling state interest in the least restrictive way possible.

### ii.   Removal from Ramadan Fasting List

#### a.   Defendants Have Not Imposed a Substantial Burden on Plaintiff's Religious Exercise

Chaplain Hoyt's removal of Plaintiff from the Ramadan fasting list did not impose a substantial burden on Plaintiff's religious exercise because Plaintiff did not simply decide not to fast, but rather, without consulting Chaplain Hoyt or any other NCF personnel, Plaintiff attempted to receive additional food by accepting his Ramadan meals and then also going to the chow hall to eat with the non-fasting inmates.  Hoyt Aff.  ¶ 20.  During Ramadan, fasting

inmates are given the equivalent of three meals at one time each day that, according to Ramadan fasting practice, should be eaten after dark.  Ex. A-9.  The inmates take their bagged meals to their cells and are free to eat them when they choose.  Hoyt Aff. ¶ 17.  If Plaintiff felt too unwell to fast for the entirety of the daylight period, he could have simply have broken his fast and eaten his Ramadan cell feed over the course of the day.  *See id.*  By receiving his cell feed <u>and</u> going to the chow hall, Plaintiff would have in effect received twice the amount of meals that all other inmates—fasting and non-fasting—would receive that day.  *Id.*  Taking extra meals is a disciplinary offense.  *See id.* at ¶ 22.  Not allowing a fasting inmate to receive double meals does not equate to the enactment of a policy that substantially burdens Plaintiff's right to practice his religion.  The prison did not "put substantial pressure on [Plaintiff] to modify his behavior and to violate his belief" because Plaintiff was free to fast for Ramadan under prison policy and was supplied with food to eat in his cell.  *See Spratt*, 482 F.3d at 38.  Plaintiff's removal from the fasting list was simply a consequence of his attempt to receive an extra meal, which would have been impermissible whether or not he was fasting.

Further, as stated in the PLRA section above, Plaintiff did not notify Chaplain Hoyt, the Warden, or any other NCF staff member, that he felt the Ramadan food he received was inadequate or that he felt unwell and wanted to request a break from the Ramadan fasting menu and to go to the chow hall.  Even on the day of his removal, Plaintiff declined the opportunity to discuss the matter with Chaplain Hoyt.  Hoyt Aff. ¶ 19; Berwick Aff. ¶ 5.  If Plaintiff were ill and desired what he considered to be more nutritious food, he could have contacted the Chaplain and attempted to work out a potential solution.  *See* Hoyt Aff. ¶ 24.  Plaintiff, however, without any notice, opted to accept both his Ramadan meals and meals at the chow hall.  *See* Berwick

Aff. ¶¶ 3–4.  As a result, Chaplain Hoyt's response to Plaintiff's action does not amount to a substantial burden on Plaintiff's ability to practice his religion.

> **b.  Even If A Substantial Burden Exists, That Burden Is In Furtherance Of A Compelling Governmental Interest, And Is The Least Restrictive Means Of Furthering That Compelling Governmental Interest.**

Even if the Court finds that Chaplain Hoyt's decision to remove Plaintiff from the Ramadan list imposed a substantial burden on his religious exercise, this course of action is the least restrictive means of preventing the disorderly and unmanageable practice of fasting inmates accepting their Ramadan meals and going to the chow hall when it suits them.  *See Spratt*, 482 F.3d at 37.  If fasting inmates were permitted to, based on their own desire, receive twice the food allotted to non-fasting inmates, the result would be an inappropriate and inequitable policy that would be extremely difficult for prison staff to administer.  Hoyt Aff. ¶ 22.  First, a policy whereby some inmates, when they feel it necessary, can receive more meals than others is not appropriate for the prison environment.  Such as policy creates a substantial risk of discontent among the inmates not permitted to receive the additional food.  *Id.*  Further, if fasting inmates are permitted to receive Ramadan meals and attend meals at the chow hall, the inmates could save their surplus food and use the retained food items for improper purposes such as trading it for items or services from other inmates.  *Id.*

Such a policy would also be difficult to oversee.  For instance, even if prison staff attempted to permit a break in fast where fasting inmates could opt out of receiving Ramadan meals and eat in the chow hall, it would require daily individualized monitoring of who is and who is not permitted to be in the chow hall.  *Id.* at ¶ 23.  These numbers could potentially fluctuate daily as certain inmates decided to fast and others decided to go to the chow hall.  *Id.*

Furthermore, such fasting would require an addition of time to Ramadan to permit inmates who decided not to fast on certain days time to make up those days.  *Id.*  This would result in uneven Ramadan fasting periods for different inmates that prison administration would need to track.  *Id.*  The least restrictive way to let Muslim inmates fast for Ramadan is, as NHDOC currently permits, to have a set Ramadan period where inmates receive Ramadan meals that they are free whenever they choose, presumably after sunset.  *Id.* ¶ 24.  If a serious health concern arises the inmate, instead of attempting to receive extra meals, is to enter into a discussion with the Chaplain or health services about how to solve the dilemma.  *Id.*  Therefore, prohibiting inmates who are receiving Ramadan meals from also going to meals at the chow hall is the least restrictive means of achieving the government's compelling interest in an safe, orderly, and administratively manageable Ramadan fasting period for Muslim inmates.

### C.  Adequacy of Ramadan Food

Plaintiff's motion for summary judgment does not refer to or even mention his argument regarding the adequacy of the meals served to fasting inmates during Ramadan 2012 and does not present any evidence in support of his claims regarding the food served.  Further, as discussed in detail above, Plaintiff did not properly alert prison staff to any perceived inadequacy in the 2012 Ramadan meals by filing an IRS or grievance form at any level of the prison's internal grievance system and thus, pursuant to the PLRA, is not entitled to maintain his action regarding this issue.  Finally, the Ramadan 2012 Schedule and the affidavit testimony of Joseph Pelletier demonstrate that the fasting inmates received the equivalent of three meals when they received their daily meal bags and that these meals complied with the same nutritional mandates as all other prison meals as established in PPD 8.10.  Pelletier Aff. ¶ 6; *see also* Ex. E-1.

The breakfast meal consisted of "bagged breakfast foods" that contained a coffee cake or muffin, cold cereal, a juice and two pints of milk.  Pelletier Aff. ¶ 4.   The lunch meal consisted of: four slices of bread; one five ounce non-pork sandwich meat; two slices of cheese; one packet of crackers/chips; condiments; dessert (if available); and one pint of milk.  *Id.* at ¶ 5.  The dinner meal or "hot meal" consisted of whatever meal was served to non-fasting inmates that night and was also the same quantity of food.  The fasting inmates would receive this dinner meal as a cell feed that they could eat whenever they wished, which according to Ramadan practice would be after sunset and before sunrise.  *Id.* at ¶ 6.  None of these food items are described as frozen and there is nothing called "birdseed" on the menu.  *Id.*

## CONCLUSION

For the reasons stated previously herein, the Defendants respectfully request that this Honorable Court grant the State Defendants' cross-motion for summary judgment and deny the Plaintiff's motion for summary judgment.

Respectfully submitted,

By their attorneys,

JOSEPH A. FOSTER
Attorney General

Date:  August 22, 2013

/s/ Francis C. Fredericks
Francis C. Fredericks, Bar No. 21161
Attorney
Nancy J. Smith, Bar No. 9085
Senior Assistant Attorney General
New Hampshire Department of Justice
33 Capitol Street
Concord, New Hampshire 03301-6397
(603) 271-0447; (603) 271-3650
nancy.smith@doj.nh.gov
francis.fredericksJr@doj.nh.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was mailed this 22nd day of August 2013, postage prepaid, to:

> Dominic S. Ali, #81829
> Northern NH Correctional Facility
> 138 E Milan Rd.
> Berlin, NH 03570

<u>/s/ Francis C. Fredericks</u>
Francis C. Fredericks