UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Dominic Ali,                                    \*
        Plaintiff                               \*
                                                \*
    v.                                          \*    12-cv-00364-SM
                                                \*
                                                \*
Warden Edward Reilly, Chaplain Dana Hoyt,       \*
Scott Watson, John Masse, Shanon Berwick        \*
        Defendants                              \*
                                                \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


AFFIDAVIT OF DANA C. HOYT

I, Reverend Dana C. Hoyt, upon oath do hereby depose and state as follows:

1.      I am currently employed by the New Hampshire Department of Corrections as

Chaplain at the Northern New Hampshire Correctional Facility (NCF).  I have served as

Chaplain at NCF on a part-time basis from April 5, 2012 until February 25, 2005, when I became

the full-time Chaplain.  I make this affidavit on my personal knowledge.  All documents attached

hereto are true and correct copies of the documents described.

2.      NHDOC has a religious programming policy that permits the "celebration of the

sacramental rituals necessary to meet minimal requirements of a given religious faith, providing

there is an Approved Religious Volunteer to lead such rituals or if the chaplain is qualified to

lead rituals of that particular faith." The term "Approved Religious Volunteer" is defined as a

"religious volunteer who has met all institutional application requirements and had obtained

volunteer training."  This is outlined in Policy and Procedure Directive ("PPD") 7.17, attached

hereto as Exhibit A-1. Volunteer training is directed by PPD 2.24, Citizen Involvement and

Volunteers, attached hereto as Exhibit A-2.

1

3.      NHDOC has a prescribed list of approved religious items for each faith that each inmate of that declared faith can possess. For someone who is practicing the Muslim/Islam faith, the individual is allowed the following: One (1) medallion, one (1) prayer rug, two (2) kufi (skull cap), one (1) strand of prayer beads, a Qur'an, and a number of Halal soaps/lotions that are not to exceed the numbers that are permitted through the canteen.  *See* Ex-A-1. Like other recognized faith groups, Muslims are also allowed to request dietary restrictions, such as the no pork diet important to some Muslim practitioners, are allowed facial hair restricted to the length allowed for security purposes and allowances are to be made at school or work to allow time for prayers if the inmate chooses.  *See id.*; *see also* Ex. A-8.

4.      NHDOC's policy requiring approved religious volunteers is based on legitimate safety and security issues that apply to all activities within the walls of the prison that requires that no inmate or group of inmates is to be given control or authority over other inmates.

5.      Allowing inmates to be in positions of authority over other inmates has been documented to facilitate the formation of prison gangs, and even if that is not the case, has also led to intimidation or strong-arming to obtain preferred food, canteen items, and even sexual favors for these self appointed leaders.  Furthermore, inmates may not gather independent of the direct supervision of appropriate staff or qualified volunteer.  This is outlined in PPD 5.36 and is attached hereto.  *See* Ex. A-3.  This policy is related to the legitimate penological objective of preventing security and administrative problems.

6.      The Chaplains at one time attempted to supervise other faith groups such as the Muslim faith group, however this practice had to be discontinued due to disrespectful and threatening conduct by inmates in the faith group toward myself.

7.      For instance, in 2009 I supervised inmate-led Jum'ah services at NCF.  Gradually, I noticed that the inmate leading the Jum'ah services was using his position to spread hatred for other religions and prison staff and administration.  I had warned this inmate several times about this type of conduct and that continuing to act in this manner would result in his exclusion from the group.  The inmate, however, continued to disobey my cautioning.

8.      On October 30, 2009 this inmate's group-leading behavior escalated into a major incident.  Having been previously warned against pursuing "non-religious" dissertations in his addressing the other inmates during Jum'ah services, the aforementioned inmate, on this date, spoke very militantly, inflammatorily, and incitingly toward the other inmates at the service, and disrespectfully to me.  When I told him to cease, he said, "You can't interrupt our service!"  I then told him to leave and go back to his block, and he refused, trying to argue the point.  I picked up my radio and said, "You get your stuff and go back to the block now, or I'm going to call."  He again started arguing, so I called for an officer.  Then the First Responders came in, telling the inmate to come with them.  As he got up, the inmate said, "Mother Fucker, this is bullshit" among other things.  After the First Responders got him in the hallway he said, "I'm going to kill that Mother-Fucker," referring to me.

9.      Because of this incident, inmate-led groups are no longer permitted, even with the supervision of a Chaplain or other staff member.  If the religious group meeting pertains to a subject that I am trained in, I will lead the meetings.  If the religious group meeting pertains to a subject that I am not trained in, such as Jum'ah services, an Approved Religious Volunteer must lead the meetings.

10.     Since inmate-led groups are now prohibited, I have attempted on numerous occasions to find volunteers in the Muslim community to lead a worship service pursuant to PPD

7.17.  *See* Ex. A-4.   These communications and visitations began in as early as 2007 and continue to the present.  I have reached out to Muslim communities in Manchester as well as on the Seacoast.

11.     Although locating Muslim volunteers to come to the Concord and Berlin facilities has been a uniformly difficult task, my counterpart at the New Hampshire State Prison for Men in Concord, Chaplain James Daley, has recently been successful in finding Muslim volunteers to lead Jum'ah services.   While Jum'ah services in Concord have been intermittent due to volunteer availability and not due to any unwillingness on the part of NHDOC to continue them; last fall an Approved Religious Volunteer was found to serve as an Imam at the Concord facility.

12.     This Approved Religious Volunteer has completed the required security training and has now been performing Jum'ah services since December 2012 at NHSP at least one time per month.  These services are recorded and sent to NCF.  *See* Exhibit A-5.  The Jum'ah services are broadcast over the NHDOC inmate TV channel at both NHSP and NCF between 1:00 and 3:00 P.M. every Friday so that on weeks when the volunteer is not able to come and for inmates at NCF, participation remotely is available.

13.     Part of the difficulty in finding an appropriate Approved Religious Volunteer for the Muslim faith, as well as many other faiths less populous in New Hampshire, has been that the few trained leaders such as Imams in those faiths have congregations that they are responsible for at the times that those faiths normally meet for services.  Additionally, in the case of NCF, the facility's remote location in the northern and sparsely populated area of the state makes it difficult to find a local volunteer or a volunteer from another area willing to travel the significant distance to the prison.  *Id.*   As a result, the search for a volunteer Imam to lead Jum'ah services

at NCF is ongoing.  If a qualified Imam were available and willing to lead Friday Jum'ah services at NCF, the services would occur just as they do in Concord.

14.     While there are currently no live Jum'ah services at NCF, inmates are free to reach out directly to the faith group of his/her religion in the community and seek additional religious guidance through direct correspondence or by personal visits.  *See* Ex. A-6; A-7.  These additional avenues to the practice their faiths have always been available to the Muslim inmates at the NHDOC, even when there has been no available Approved Religious Volunteer.

15.     Inmates practicing Islam are also permitted to observe Ramadan and their dietary needs, and feeding times are changed accordingly.  This is not dependant on the availability of an Approved Religious Volunteer.  At the conclusion of Ramadan they are provided with an Eid Ul Fitr feast ("Eid feast") which marks the end of Ramadan. They are also provided with an Eid Ul Adha feast which marks the end of Hajj.  Both feasts require an Approved Religious Volunteer, which I have been successful in securing for each of the past three years.  *See* Ex. A-1.

16.     Since at least June 9, 2010 I have been in contact with Imam, Mosfek Talukder from the Islamic Society of Greater Manchester.  *See generally* Ex. A-4.  For a period of time in 2010, I arranged for Mr. Talukder to lead weekly Jum'ah services at NCF.  *See* Ex. A-4 at 3, 14, 17.  However, a change in his employment made it impossible for him to continue to come to NCF every Friday.  *See* Ex. A-4 at 18.  Mr. Talukder and I worked together to find a replacement for him, however we were unable to find an Imam able to consistently come to NCF.  *See* Ex. A-4 at 19, 22.  Mr. Talukder does, however continue to come to NCF when his schedule permits. For instance he has come to NCF to lead the end of Ramadan Eid feast in 2011, 2012 and, most recently, this year on August 9, 2013. Ex. A-4 at 22, 24, 26, 44–45.  At last year's Eid feast, held at NCF on August 25, 2012, I discussed with Mr. Talukder the possibility of him coming to the

prison on a monthly basis to teach the Muslim inmates and lead them in prayer.  Ex. A-4 at 40.  I followed up with Mr. Talukder about providing Jum'ah services at NCF via email on October 16, 2012 and arranged for Mr. Talukder to come up to the NCF for a meeting on Sunday October 21, 2012.   To enable interested inmates to attend the meeting, I met with several of Muslim inmates, including Plaintiff, and invited them to attend the Sunday meeting.  The meeting between the inmates and Mr. Talukder occurred on October 21, 2012.  Ultimately, however, due to time constraints, Mr. Talukder, determined that he was unable to routinely provide his services to NCF.  *See* A-4 at 42.  Mr. Talukder does continue to visit and lead prayer at NCF on a periodic basis as evidenced by his participation in this year's Eid feast held on August 9, 2013.  Ex. A-4 at 44–45.   At this year's Eid feast, Mr. Talukder also mentioned that he plans to attend the next Islamic feast at NCF this September.

17.    NHDOC permits Muslim inmates to fast for the approximately 30 day Ramadan period.   During this period, inmates who wish to participate in Ramadan fasting are to request that they be added to the fasting list.  Inmates on the fasting list will receive bagged meals that they pick up when the call for Ramadan participants is made at the supper feed as described on the Ramadan 2012 Schedule attached hereto.  Ex. A-9.  Inmates keep the food in their cells.  The The bagged food permits the inmate to fast during the daylight by allowing the inmate to have the food to eat after dark or before dawn.  The inmates have access to the food the entire time they are in their cells and prison staff does not monitor when the inmate actually eats the food.

18.    Plaintiff was on the 2012 Ramadan fasting list. According to the Ramadan 2012 schedule the fasting inmates received the equivalent of three meals when they received their daily meal bags.  *See* Ex. A-9.  The food items served are described in detail in the affidavit of Joseph Pelletier.  *See* Exhibit E, Affidavit of Joseph Pelletier ¶ 5.  The 2012 Ramadan Schedule

also stated that any inmate who shows up for any meal other than this special chow call will be automatically removed from the Ramadan fasting list.  Ex. A-9.

19.     On or about August 13, 2012, Lieutenant Berwick informed me that Plaintiff had attended breakfast in the chow hall.  This meal at the chow hall was in addition to the Ramadan meals Plaintiff received the night before.  I informed Lt. Berwick that Plaintiff violated the Ramadan fasting rules and that I was going to remove him from the list.  I requested that Lt. Berwick inform Plaintiff that his act of showing up at the chow hall violated the Ramadan fasting rules and would result in his removal from the fasting list.  I also informed Plaintiff that I was available if he wanted to discuss the matter with me.  Plaintiff did not request to discuss the matter with me.

20.     The rules regarding Ramadan fasting need to be clear and firm.  Fasting inmates are given food to eat in their cells and the only stipulation is that they do not show up for meals at the chow hall.   If fasting inmates were allowed to receive bagged meals and go to the chow hall, they would receive twice the amount of meals that all other inmates—fasting and non-fasting—would receive that day.  For the same reasons that inmates are not allowed to take two lunches from the chow hall line at any given meal, fasting inmates cannot be allowed to have both the Ramadan cell feeds and to take the meals in the chow hall.

21.     I do not personally create the Ramadan menu or prepare the Ramadan food.  I also do not hand out the Ramadan feeds to the inmates.  I did not receive any inmate requests slips, letters, or verbal communications during 2012 Ramadan from Plaintiff or any other inmate stating that the Ramadan feeds were inadequate in size or nutrition.  If Plaintiff was unwell and felt that the Ramadan feed was not sufficient, he could have spoken with me or someone at health services.  Plaintiff did not speak with me about this issue and to my knowledge he did not

discuss the matter with health services.  Instead, Plaintiff simply attempted to receive an additional meal at the chow hall.

22.     Permitting fasting inmates to do this would be extremely problematic.  A policy whereby some inmates, when they feel it necessary, can receive more meals than others is not permitted in the prison environment.  Such a policy would be unfair and creates a substantial risk of discontent among inmates not permitted to receive the additional food.   In fact, taking extra meals would be a violation of PPD 5.25 51C, possession of state property in excess of authorized amounts or 53B/C, theft by unauthorized taking, and could result in disciplinary charges. Additionally, if fasting inmates are permitted to receive cell feeds and attend meals at the chow hall, the inmates could save their surplus cell feeds and use the retained food items for improper purposes such as trading it for items or services from other inmates.

23.     Such a policy would also be extremely difficult for prison staff to oversee.  For instance, even if we attempted to permit a break in fast where fasting inmates could opt out of receiving cell feeds if they are ill and eat in the chow hall, it would require daily individualized monitoring of who is and who is not permitted to be in the chow hall on that occasion. These numbers could potentially fluctuate daily as certain inmates decided to fast and others decided to go to the chow hall.  Additionally, such fasting would require an addition of time to the Ramadan fasting schedule to permit Muslims who decided to break fast time to make up those days.  This would result in uneven Ramadan fasting periods for different inmates that prison administration would need to track.

24.     I believe that the least restrictive way to let Muslim inmates fast for Ramadan is to have a set Ramadan period where Muslim inmates receive meals that they can keep in their cells and are free to eat after dark or before sunrise. The inmates should not be permitted to

receive this food for their cell and to also attend meals at the chow hall when they feel extra food would benefit them.  If a serious health concern arises the inmate, instead of attempting to receive extra meals, is to enter into a discussion with me and explain why they need to deviate from fasting or the Ramadan fasting menu.

I declare that the foregoing is true and correct under penalty of perjury.

Dated:  August 15, 2013                              \_\_\_s/Dana C. Hoyt_____
                                                                          Chaplain Dana C. Hoyt